FILED & JUDGMENT ENTERED
Christine F. Winchester

Dec 07 2010

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

J. Craig Whitley
**United States Bankruptcy Judge**

## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | **Case No. 10-30725** |
| **HAGOOD RESERVE, LLC,** | ) | **Chapter 11** |
| | ) | |
| Debtor. | ) | |
| | ) | |

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** was before this Court upon the following:

(1) First Horizon Home Loans' Motion for Stay of Order Pending Appeal, and the Debtor's Response thereto; and

(2) First Horizon Home Loans' Motion for Reconsideration and to Alter or Amend Judgment Entered by the Court on July 12, 2010, *nunc pro tunc*, and the Debtor's Response thereto.

These matters arise out of a Final Order Approving the Debtor's Motion to Assume Condominium Purchase and Sale Agreement and for Authority to Sell Real Property Free and Clear of all Liens, Claims, Interests, or Encumbrances Pursuant to Section 105(a), 363(b), 363(f), 363(m) and 365 of the Bankruptcy Code (the "Sale Order") entered July 12, 2010. Hearings on the current motions were held August 11, 2010, August 23, 2010, September 8, 2010, and September 14, 2010.

## I.      PROCEDURAL AND FACTUAL HISTORY

Hagood Reserve, LLC, the Chapter 11 debtor-in-possession herein (the "Debtor"),
filed a voluntary bankruptcy case on March 17, 2010.  The Chapter 11 filing interrupted a
foreclosure proceeding by lender First Horizon against the Debtor's sole asset, a partially
completed condominium complex.  At the filing date, the parties were also disputing
which side breached that loan agreement in a state action entitled *First Horizon Home
Loans, a division of First Tennessee Bank National Association v. Hagood Reserve, LLC,
et al.*, Case No. 09-CVS-15152, General Court of Justice, Superior Court Division,
Mecklenburg County, North Carolina.

### A.      Background

The Debtor was organized in 2005 to acquire and develop a wooded, 9.2-acre
parcel in South Charlotte.  The proposed residential development, to be known as
"Hagood Reserve," would include 36 luxury exclusive condominiums and townhomes in
three separate buildings.  The condominiums would overlook a lake surrounded by
woods and walking trails (the "Project").  The Project had an estimated completion cost
of $40 million.  Given its large size and scope, Hagood Reserve, LLC planned to stage
the Project.  Phase I included site work, landscaping, infrastructure, demolition of an
existing structure, renovation of an existing residence, and construction of two adjacent
condominiums.  Phase II would include construction of a four-story, 19-unit building.
The third and final Phase contemplated construction of a three-story building containing
14 units.

### 1.      The Property and the Project

The Debtor had purchased the Property in 2006 for $3,015,360.00 from a family

trust, the W.W. Hagood Jr. Trust (the "Hagood Trust").  Sisters Adele Hagood and Sally

James served as the trustees for the Hagood Trust.  The Property had been the Hagood

family home place for almost sixty years, and both sisters (and husband(s)) resided on the

Property.  When approached about selling the Property, the sisters were understandably

reticent.  However, due to advancing age and the difficulty of maintaining a property of

this size, the sisters acceded, on two conditions.  First, the Trust would have input into the

style and nature of the proposed development.  Second, after the Debtor renovated and

converted the James Residence into one of the three Phase I townhomes, the Jameses

would repurchase their former residence and return to the Property.

With this understanding, the Hagood Trust sold the Property to the Debtor on

March 22, 2006.  Thereafter, on June 4, 2007, the Debtor and the Hagood Trust executed

a purchase agreement providing for the repurchase of the James Residence after

completion for the sum of $600,000, plus upgrades (the "Agreement").

The Project required extensive rezoning and re-permitting.  After a year of efforts

by the Debtor, the City of Charlotte rezoned the Property in January of 2007 to permit the

specific multi-family use envisioned by the Debtor.[1]  The permit review process took an

additional six months to complete.

With the Property rezoned and permitted, the Debtor approached potential lenders

in the Fall of 2007 to obtain financing for the Project.  It soon entered into negotiations

with First Horizon Home Loans, a division of First Tennessee Bank National Association

(the "Bank").  The Debtor fully disclosed its plans for developing the Property to

the Bank.  On December 3, 2007, the Bank agreed to lend Hagood $24,420,000.00 for the

---

[1] The entire parcel was rezoned as "urban residential two" ("UR2") in 2007 and 2008, which permits
condominiums and higher density developments.  Hearing/Trial Tr. 8-9, June 16, 2010, ECF No. 88.

phased (three stages) development of the Project.

Phase I construction began in January 2008. The Bank extended funds via draw requests for Phase I construction until late November 2008. At that point, an unpaid grading subcontractor filed a claim of lien against the Property. That claim was resolved and the lien released by June 2009. However, after the lien was filed, the Bank refused to fund any additional draw requests on the Project. It declared the loan to be in default in June 2009 and accelerated its indebtedness.

### 2.    The First Horizon Dispute

On July 1, 2009, First Horizon filed a breach of contract action against the Debtor and its principals in Mecklenburg County Superior Court. *First Horizon Home Loans, a division of First Tennessee Bank National Association v. Hagood Reserve, LLC, et al.*, Case No. 09-CVS-15152. The Defendants counterclaimed, arguing that it was First Horizon—not them—that breached the loan agreement. Specifically, the Defendants alleged that after the 2007-08 national real estate meltdown, First Horizon decided to remove itself from this lending market. To this end, First Horizon engineered a series of putative defaults in this loan to justify accelerating the loan and thereby avoid its obligation to provide continued funding on the Project.

On January 12, 2010, the Bank instructed the substitute trustee under the Deed of Trust to institute a foreclosure proceeding under the Deed of Trust with respect to the Property in Mecklenburg County. A hearing on the foreclosure of the Deed of Trust was scheduled for February 18, 2010. The Debtor filed its bankruptcy case on March 17, 2010, in order to stop the foreclosure and permit it time to get to trial in the state court action.

Shortly after bankruptcy, the state action was removed to this bankruptcy court. However, with a trial in state court already calendared (then set for April 2010), and due to the presence of non-debtor parties, the action was remanded to the state court.[2]  Order of Permissive Abstention and Remand, April 22, 2010, No. 10-3061, ECF No. 21.

### B.    The James Residence Sale

Even as the two sides have continued to battle one another in the state action, they also have expanded their legal wrangling over the Project to bankruptcy court.  The Sale Order and the present motions are the latest of these contests.  Their positions are diametrically opposed.

First Horizon believes the Project is now economically unfeasible.  It wants to foreclose its deed of trust, bulldoze the existing Phase I infrastructure (including the James Residence) and remarket the Property as undeveloped land.  If pursued, this course would likely return to First Horizon only a part of its outstanding debt and would leave all other creditors entirely unpaid.

The Debtor believes the Project is viable.  It proposes to complete Phase I, sell the three townhomes, and then delay completion and marketing of Phases II and III until the local real estate market recovers.

### 1.    The Sale Motion

To that end, on May 11, 2010, the Debtor filed its Motion of the Debtor to Assume Condominium Purchase and Sale Agreement and for Authority to Sell Real Property Free and Clear of Any Liens, Claims, Interests or Encumbrances, Pursuant to Sections 105(a), 363(b), 363(f), 363(m) and 365 of the Bankruptcy Code, and then an

---

[2] The trial in state court was continued to permit additional discovery.  However, the parties have recently advised that the Bank has been granted summary judgment on most of the claims presented in that action.

amended motion (as amended the "Sale Motion").

In the Sale Motion, the Debtor sought to: (1) assume the Purchase Agreement with the Hagood Reserve for the redevelopment/repurchase of the James Residence, now a condominium (the "James Residence"); and (2) sell the James Residence to the Hagood Trust (effectively to the Jameses) by private sale, and free and clear of all liens, claims, interests, and encumbrances.

First Horizon opposed the Sale Motion on a variety of grounds. Its primary objection was based upon its belief that the market would no longer support condominium sales at the necessary price points. See Objection to Mot. and Amended Mot. of Debtor, ECF No. 54 (the "Sale Objection"). The Bank was also concerned about the costs necessary to complete the James Residence and certain credits to be given to the Trust. First Horizon also argued that reselling the James Residence would irrevocably commit parts of the Property to the Project. The Bank further pointed out that several necessary closing documents, including the Declaration of Condominium, had yet to be prepared.

### 2.    The Sale Motion Hearings and Order

An evidentiary hearing on the Sale Motion was held on June 16, 2010. In addition to those facts previously stated, during the hearing, Debtor's witness testimony established that the initial phase was to include renovating the James' house and finishing the two townhomes, stabilizing the rest of the site, and finishing the infrastructure. Hearing/Trial Tr. 6-7, June 16, 2010, ECF No. 88. Then the next phases would occur, which included the nineteen-unit building and then the fourteen-unit building. Id. at 7.

The James Residence was largely renovated, and the two adjacent townhomes

were about 75-80% complete.  Id.  As to the former, the interior was complete, but some

additional work was needed to complete the exterior of the structure.  Id.  The primary

access road was paved but not top-coated, and the infrastructure for all 36 units for the

site was completed.  Id. at 7, 49, 57.  The revised proposed purchase price of the James

Residence was just under $690,000, less credits for an earnest money deposit and certain

work paid for by the buyer.  Id. at 15.

The two sides presented competing evidence regarding the desirability of

completing the Project.  The Debtor's appraiser, T.B. Harris, Jr. ("Harris"), viewed

completion as the only viable course of action.  Harris pointed out that the Property was

zoned "UR-2 (CD)," meaning that it was specifically approved for the current site plan.

Id. at 49-50.  He noted the "site can only be developed as it sits here specifically."  Id. at

54.  In Harris' expert opinion, the highest and best use of the Property was to complete

and sell the James Residence; complete and market the two adjacent condominium units;

and then hold the remainder of the Property "until the market turns."  Id. at 52.  At that

point in time, the two multi-unit buildings would be constructed, and condominiums

would be sold consistent with the original site plan.

The Bank's appraiser, Fitzhugh Stout, offered a different view.  He testified that

the Project was ill-conceived and could not be profitable.  Id. at 88.  In his view, the

highest and best use of the Property would be achieved by removing the existing

structures and infrastructure, and then remarketing those portions[3] of the Property

suitable for single-family residential development.  Id. at 86-89.

It should be noted that the uncontroverted testimony presented at that hearing

established that the purchase price for the James Residence was a fair value.  Id. at 42-43,

---

[3] Only a small portion of the Property is topographically suitable for development.

82.  It was also undisputed that the Trust acted in good faith with respect to this

transaction.

At the end of the hearing, the Court adopted the Debtor's/Harris' views on the

matter and gave preliminary approval to the sale.  The Court's decision was influenced

by several factors: (1) the James sale was specifically contemplated by the parties'

prepetition agreements; (2) the Bank's debt was subject to a bona fide dispute and might

not survive the state action; (3) if the Bank prevailed in the state action, the Debtor's

principals were both willing and able to carry the secured part of the Bank debt until the

Project could be completed and units sold; and (4) the James sale would realize

substantial proceeds that could be applied to the Bank debt, while not adversely affecting

the rest of its collateral.

However, given the concerns about the yet to be completed closing documents,

the Bank was afforded an opportunity to request and review documents and then raise

additional arguments relating to that documentation.  A final hearing was set for June 30,

2010.

Bank's counsel sent a request to Debtors' attorneys on June 21, 2010, requesting

certain documents "related to the assumption of the contract with and conveyance to the

Trust of the unit which may be part of the Purchase and Sale Agreement."  Debtor's Br.

in Opposition to Mot. for Recons., Ex. C, ECF No. 168-3.  The Debtor provided

requested documents on June 23, 2010, including a draft of the Condominium

Declarations.  The Debtor also informed the Bank that it had previously received a copy

of the plat map that was introduced at the hearing.

When the sale hearing resumed on June 30, 2010, the Bank raised no new

objections based on the sale documents, but reiterated prior objections to the sale.

However, the Bank made a new request.  It asked to be included in "the process of

finalizing the plats [and] finalizing the plans . . . to make sure that we know how what

they are doing is affecting our collateral and have some input into it."  Exhibits to

Debtor's Br. in Opposition to Mot. for Recons., Ex. E, at 9, ECF No. 168-6.  The Debtor

objected to turning this into a "joint effort."  Given the parties' bitter disputes, the Court

was concerned that making the Bank a joint participant would invite attempts to scuttle or

delay the sale via the state regulatory agencies.  Thus, the Bank's request was declined,

but the Debtor was directed to provide the Bank with any reasonably requested

documents.  The Bank was directed to prepare and send a list to the Debtor as to

additional documents it would like to see.  The Bank indicated that it would send this

additional request to the Debtor.  However, it did not until August 9, 2010, after the

Declarations were recorded and the Sale had closed.

During the July 30 final hearing, the Debtor made clear its intentions to close the

James sale as soon as possible.  Specifically, the Debtor asked the Court to waive the

14-day stay of the order under Bankruptcy Rule 6004(h) in order to "expedite . . . the sale

to the James[es]. . . ."  Debtor's Br. in Opposition to Mot. for Recons., Ex. E, at 85, ECF

No. 168-6.  Debtor's counsel advised that they and the Trust were interested in ". . .

closing [the sale] sooner rather than later . . . ."  Id. at 86.  The Bank again objected.  This

time the Court declined to waive the Rule's 14-day stay of action.  It was clear from the

hearing that the Debtor was planning to close the James sale at the earliest instance.

With that, the Court gave final approval to the Sale Motion.  A written order was

entered on July 12, 2010.  Final Order Approving the Debtor's Sale Mot., July 12, 2010,

ECF No. 97 (the "Sale Order").  Relevant to the current dispute, that Sale Order

contained the following conclusions of law:

(1)     The Debtor has used its best "business judgment" in determining that it is
beneficial to the estate to assume the Agreement;

(2)     The Debtor's decision to assume the Agreement is not a product of bad
faith or gross abuse of discretion;

(3)     The consideration to be received by the Debtor for the Property[4] is fair and
adequate under the circumstances;

(4)     The sale of the Property by Debtor to Purchaser pursuant to the Agreement
is the result of an arms-length transaction between Debtor and Purchaser;

(5)     Purchaser is purchasing the Property for fair value and in good faith as
referenced in Section 363(m) of the Bankruptcy Code; and

(6)     The sale of the Property to the Purchaser on the terms set forth in the
Agreement will not prejudice the rights of First Horizon.

Id.  The Sale Order authorized the Debtor:

> to sell the Property free and clear of all Liens, claims, encumbrances
> and interests to the Purchaser under the terms and conditions of the
> Agreement . . . [and] to execute and deliver all documents necessary
> to close the sale of the Property including without limitation,
> executing a deed conveying the Property to the Purchaser.

Id.

Most notably, the Sale Order included a conclusion that "Purchaser shall be

entitled to the protections of Section 363(m) of the Bankruptcy Code which ensures that,

barring certain exceptions, a sale of the Property pursuant to Section 363(b) remains valid

even if this Order is later reversed or modified on appeal."  Id.

### C.     The Bank's Appeal and Stay Motion

The Bank gave Notice of Appeal to the Sale Order on July 23, 2010, and

---

[4] In this instance, the "Property" was defined as "a condominium unit located at 5956 Colony Road,
Charlotte, North Carolina."  Sale Order, July 12, 2010, ECF No. 97.

concurrently filed a Motion for Stay of Order Pending Appeal (the "Stay Motion"). ECF No. 112. Surprisingly, rather than seeking an expedited hearing on its stay motion, the Bank scheduled[5] a hearing for August 11, 2010—some 15 days after the Rule 6004 stay expired and the Sale Order became effective.

After that period expired and the Sale Order became effective, on August 6, 2010, the Debtor recorded a Declaration of Condominium for Hagood Reserve Condominium (the "Final Declaration") and the Plat Map and Unit Ownership File with the Mecklenburg County Register of Deeds. Book No. 25813, Page No. 185. The sale of the James Residence closed on August 9, 2010, and a North Carolina Special Warranty Deed was filed with the Register of Deeds. Book No. 25814, Page No. 689. As per the Project plans, the conveyance to the Trust included the James Residence (meaning the condominium unit) and a 33.52% undivided interest in the related common areas.

The closing occurred two days before the scheduled hearing on the Bank's Stay Motion. The Bank did not learn of that closing until late in the day on August 9, when the Debtor filed its Response and Objection to the Stay Motion. ECF No. 132. That Response argued that given the closing and under Code Section 363(m), the Bank's appeal was moot. Id.

The undersigned learned of the closing just before court on August 11. The Court was surprised that the Debtor had elected to close with a hearing on the motion only two days away. The Bank was outraged. Given these developments, and in order to afford the Bank an opportunity to address the Debtor's statutory mootness argument, that hearing was continued. The Bank was invited to file any appropriate motions for relief.

---

[5] Under this Court's local rules, attorneys are authorized to self-schedule motions for pre-established hearing dates.

To that end, on August 26, 2010, the Bank filed its Motion for Reconsideration and to Alter or Amend Judgment *nunc pro tunc*. ECF No. 158. On September 10, 2010, the Debtor filed a Brief in Opposition, ECF No. 167, and finally the Bank filed a Reply to Debtor's Brief on September 13, 2010, ECF No. 169.

## II.    STATEMENT OF POSITIONS

The Bank contends that in closing the sale in the face of its pending stay hearing, the Debtor and the Hagood Trust acted collusively and in bad faith to deprive the Bank of its right to appeal the Sale Order. Further, the Bank asserts that by virtue of the Debtor's conveyance to the Hagood Trust of an undivided interest in the Project's common areas, as delineated in the Condominium Declaration, it exceeded the authority granted in the Sale Order.

The Bank asks this Court to alter or amend the Order, on a *nunc pro tunc* basis, to (1) find the Hagood Trust is not a good faith purchaser and is not entitled to any protections afforded by § 363(m) of the Bankruptcy Code; (2) require the Trust to reconvey the property conveyed to it, including both the condominium unit and the 33.52% share in the Common Elements to the Debtor; and (3) require the Debtor to terminate the Condominium Declaration and withdraw or terminate the recorded Plat.

Alternatively, the Bank asks that the Court reconsider and delete, again on a *nunc pro tunc* basis, its finding that the Trust was a good faith purchaser under § 363(m) of the Bankruptcy Code, pending the outcome of the Bank's appeal of the Order. It asks that the Debtor and the Trust be prohibited from taking any further action in connection with the Property or the Unit. Finally, the Bank asks that the Debtor or its counsel be taxed with the Bank's attorneys' fees and expenses.

The Debtor counters that the Reconsideration Motion is an impermissible
collateral attack on the Sale Order and argues that grounds do not exist to reconsider the
motion under Rule 60(b), particularly "exceptional circumstances," since: (a) the James
Residence, et al., was sold to the Trust in accordance with the Agreement and the Sale
Order; (b) the Bank was aware that the Debtor and the Trust intended to close the
transaction as soon as possible but failed to seek an expedited hearing on its stay motion;
(c) the Debtor provided the Bank with all documents it requested, including the Draft
Declaration; and (d) the undisputed testimony established that the sale price of the James
Residence was fair, and the resulting proceeds from the sale would be beneficial to all
parties, including the Bank.

Additionally, and given that the sale has already closed and the parties have acted
in reliance thereto, the Debtor argues that the Rule 60(b) motion is both untimely and
unfairly prejudicial to it and the Hagood Trust.  Finally, the Debtor argues that under
Section 363(m), and as interpreted by the Fourth Circuit Court of Appeals, the Bank's
appeal is moot.

**Held:** Although the Debtor's decision to close the sale of the James Residence
two days before a scheduled hearing on the Bank's Stay Motion may be at variance with
local custom, closing the sale was legally authorized and the property interests conveyed
were consistent with the Debtor's motion, the order approving the sale, and the parties'
prepetition agreements.  Under controlling Fourth Circuit precedent interpreting Code
Section 363(m), the closing of that sale to the Hagood Trust, a good faith purchaser,
moots the Bank's appeal.  Even if this were not the case, the Bank has failed to establish
grounds to reconsider the Sale under Rule 60.  Therefore its Motions are denied.

III.   **DISCUSSION**

A.   **Under 11 U.S.C. § 363(m), the Bank's Appeal and the issues discussed in the Motion with regard to the sale of the condominium are moot because the property was sold to a good faith purchaser, and no stay had been granted at the time of sale.**

1.   **The Debtor's and Trust's actions taken while the Bank's Stay Motion was pending were valid under <u>Hazelbaker</u>.**

The Bank's first argument in favor of rescinding the sale, etc., is based upon the fact that the Debtor closed on the property only two days before the hearing on the Bank's Stay Motion.  The relevant bankruptcy statute is Code Section 363(m), which provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 § U.S.C. 363(m).  The question to be decided is whether the purchaser in this case, the Hagood Trust, meets the standards of a good faith purchaser.  The Bank argues that it does not.

The Bank notes that "[t]ypically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  <u>Abbotts Dairies of Pennsylvania, Inc.</u>, 788 F.2d 143 (3rd Cir. 1986).  The Bank argues the Debtor and the Hagood Trust engaged in collusion and attempted to take "grossly unfair advantage" of the Bank with a private sale, thereby destroying the purchaser's good faith status.  Mot. for Recons. and to Alter or Amend J., August 26,

2010, ECF No. 158.  Specifically, the Bank sees misconduct in that (1) the Sale was closed while the Bank's Stay Motion was pending, and (2) the Debtor conveyed a partial undivided interest in the common areas to the Hagood Trust.

As expressed at the August 11 hearing, the undersigned was not particularly pleased that the Debtor had closed the sale two days before the stay hearing.  Under local notions of professional courtesy, one might have expected Debtor's counsel to have apprised the Bank's counsel of the proposed closing date and either delayed the closing until after the hearing or else afforded her the opportunity to seek expedited relief on the motion.  Instead, the Debtor accelerated its actions in order to close the sale prior to the stay hearing so as to moot the motion.

There is a longstanding preference by the bankruptcy judges in this judicial district that cases be decided on their merits, rather than on procedural maneuvers.  Similarly, the bankruptcy bar in the Western District of North Carolina has a long tradition of professional courtesy to one another—a practice that inures to the benefit of all.  Such courtesies are founded on equal parts fairness and pragmatism.  Obviously, what comes around also goes around.  A procedural advantage taken at the expense of one's opponent is not soon forgotten and is usually repaid with similar "short sheeting" in future cases.  As a matter of local custom, the Debtor's actions to preclude the stay hearing by accelerating the sale closing fell short of local expectations.

However, if lacking by local notions of courtesy, the Debtor's decision to close the sale while the Bank's Stay Motion was pending was nonetheless legally authorized under Section 363(m) as interpreted in Hazelbaker v. Hope Gas, Inc. (In re Rare Earth Minerals), 445 F.3d 359 (4th Cir. 2006).

In <u>Hazelbaker</u>, the plaintiff owned an undivided fractional interest in a certain piece of property's oil and gas.  The rights were leased and eventually assigned to Rare Earth Minerals, Inc. ("Rare Earth"); however, Rare Earth stopped making royalty payments.  As a result, Plaintiff believed Rare Earth had abandoned the lease and released the oil and gas rights to a third party.  Rare Earth filed for Chapter 11 bankruptcy protection, and the trustee sought to assume the leases into the estate and sell them—to which Plaintiff objected.  The bankruptcy court ultimately approved the assumption of leases and authorized the sale of estate assets.

Ms. Hazelbaker filed a notice of appeal and asked the bankruptcy court for a stay of the sale pending appeal; however,

> [s]he did not seek an expedited hearing on the stay request, and in fact requested a continuance from the original hearing date set by the bankruptcy court.  As a result, the hearing was set for July 12, eleven days after the sale had already been finalized in accordance with the court-approved schedules.  At the hearing, the bankruptcy court denied Hazelbaker's motion.

<u>Hazelbaker</u>, 445 F.3d at 362.  On appeal, the Court looked to the language of 11 U.S.C. § 363(m) in reaching its conclusion that Hazelbaker's appeal was moot.  The Court concluded that if the sale of assets has not been stayed in a bankruptcy case, then a challenge to the validity of the sale is moot because the Court has no effective remedy available to it.  <u>Hazelbaker</u>, 445 F.3d at 363.  Further, the Court noted that Congress has expressed a "strong preference for finality and efficiency in the bankruptcy context, particularly where third parties are involved"; this sentiment is reflected in Section 363(m).  <u>Id.</u>

Specifically, Congress wishes to avoid situations where purchasers of assets from a bankruptcy estate are "dragged into endless rounds of litigation to determine who has

what rights in the property[,]" as such a result would be unfair to good faith purchasers and would greatly reduce the estate's value.  Id. (quoting In re Sax, 796 F.2d 994, 998 (7th Cir. 1998)).  To be successful, this framework merely "requires that the claimant request, *and be granted*, a stay of the sale pending the appeal." Hazelbaker, 445 F.3d at 363 (emphasis added).

Per Hazelbaker and Congress' preference for finality and efficiency in situations like the case at hand, this Court has no choice but to deny the Bank's Motion to Reconsider and to Alter or Amend Judgment.

It should be noted that if the Debtor's actions were lacking in courtesy, the Bank's actions were also lacking in foresight.  For just as Ms. Hazelbaker failed to seek an expedited hearing on her stay request, and ultimately failed to obtain a stay, so did the Bank.  The Bank was on notice that the Debtor would close at the earliest occasion.  From the time the Court told the Bank on June 16, 2010, that it was approving the sale to the Trust barring extraordinary circumstances, to July 26, 2010—the date the Rule 6004(h) stay expired—the Bank had over 40 days to determine if it should appeal the Sale Order or seek to extend the stay.  Despite the Debtor's statements that it was seeking to expedite the sale, the Bank made no attempt to continue the Rule 6004(h) stay so its motion might be addressed; nor did it seek an expedited hearing on its stay request.

> **2.     The Section 363(m) protections also extend to the conveyance to the Hagood Trust of an undivided interest in the Project's Common Areas.**

The Bank also finds fault in the Debtor's filed declarations and the undivided interest conveyed to the Hagood Trust in the common areas.  [The details of this objection are restated below in our discussion of Rule 60.]  It maintains that these actions

also destroy the "good faith" of the purchase.

The most difficult aspect of this dispute is whether the Section 363(m) protections to the Hagood Trust extend to the Debtor's conveyance of the undivided interest in the condominium.  At the time of the stay hearing, there was a question in the Court's mind as to whether the interests actually conveyed exceeded that which were sought in the Debtor's motion and authorized in the Sale Order.  However, after a careful review of the parties' agreements, supporting documentation, and pleadings, the Court believes that the interests conveyed were not beyond the ambit of the contemplated sale or their reasonable expectations.

The arguments and evidence presented by the parties were in the main focused on the condominium unit and whether selling it would hurt the remainder of the Property[6], and not on the common areas.  Moreover, the Final Order Approving the Debtor's Motion to Assume Condominium Purchase and Sale Agreement, drafted by Debtor's counsel, defined the "Property" to be conveyed to be "a condominium unit located at 5956 Colony Road, Charlotte, North Carolina."  Sale Order, ECF No. 97.  Nothing further appearing, the suggestion was that the property to be sold was the James Residence and nothing more.

The primary focus of the sale hearing was also on the James Residence and the two adjacent units and how a transfer of the same would affect the remainder of the tract.  The Debtor's expert testimony indicated that this part of the tract could be sold, substantial funds be realized, and the Jameses be afforded the benefit of their bargain (one that both Debtor and Bank had accepted before bankruptcy)—without adversely affecting the Bank's remaining collateral.  While the Bank argued that the sale committed

---

[6] Here we refer to the Property in the broad sense, not just the James Residence.

it to the Project,[7] the Bank's post-hearing arguments suggested that the Debtor had actually done much more by conveying more property than what was authorized and by suggesting the Debtor's assertions about the sale's effects were disingenuous and misleading.

However, having reviewed the Purchase Agreement, the Sale Motion, and the Project documentation in detail, the Court is satisfied that the Debtor did not exceed its sale authority. It is certainly true that the Court gave substantial consideration to Harris' testimony that sale of the James Residence would not injure the remainder of the collateral. However, as described below in greater detail, there is ample reason for the Debtor to believe that this was in fact the case. One can now argue whether that belief is correct. However, if the Court's conclusion that sale of the James Residence would not adversely affect the rest of the Property was erroneous, that was an issue that the Bank—in the exercise of due diligence—should have preserved for appeal via a timely sought stay.

The Bank claims it was unfairly surprised that the Debtor conveyed both the Unit and a 33.52% interest in related common areas to the Trust. I disagree. The Bank was (or should have been) aware of the contents of the underlying contract between the Debtor and the Hagood Trust, its own loan documents, the terms of the Draft Condominium Declaration, and the requirements of the North Carolina Condominium Act. All of these documents contemplate and/or require that a unit owner receive an undivided interest in the condominium common elements. Indeed, the Bank specifically objected to the sale on the grounds that a transfer of the James Residence might impact

---

[7] Not an unreasonable thing itself since that is what the parties had agreed to prior to bankruptcy. It is the Bank that seeks to change the nature of the Debtor's business by jettisoning the Project and seeking to resell the property for single family use.

the remainder of the Property.  As such, the Bank's latest argument, that the conveyance

by the Debtor of an interest in the common areas was unforeseen and in bad faith, is

refuted both by the record in this proceeding and by applicable law.

> 3.   **Sale of the James Residence required conveyance of an interest in Common Elements.**

Although the hearing testimony was primarily focused on other matters, it would

be legally impossible for the Debtor to convey the James Residence to the Hagood Trust

without simultaneously conveying an undivided interest in the Common Elements.  In the

Sale Motion, the Debtor specifically moved to assume the June 4, 2007 Purchase and

Sale Agreement.  <u>See</u> Sale Motion 1, ECF No. 45.  The Agreement plainly states that the

conveyance of the James Residence "shall include an undivided interest in the 'Common

Elements' of the Condominium."  Sale Motion, Ex. A ¶ 2.A., ECF No. 45-1.

An executory contract cannot be assumed in part, but must be assumed or rejected

in its entirety.  <u>See</u> <u>NLRB v. Bildisco & Bildisco</u>, 465 U.S. 513, 531 (1984); <u>In re</u>

<u>AbitibiBowater Inc.</u>, 418 B.R. 815 (Bankr. D. Del. 2009).  Therefore, it would be

unreasonable for the Bank to conclude that this provision, providing for the conveyance

of an interest in the Common Elements, would somehow be excised from the Agreement

upon the Court's approval of its assumption in the Sale Order.

Further, it was clear from the outset of the Bank's business relationship with the

Debtor that it was lending funds for the development of a condominium project.  The

December 3, 2007 Loan Agreement between the Debtor and First Horizon specifically

states that the $24,420,000 loan proceeds were to be used for the "direct and indirect

costs of construction of the Improvements . . . ."  <u>See</u> Mot. for Relief from Stay, Ex. A §

2.2., ECF No. 31-1.  The Loan Agreement defines the contemplated "Improvements" as

20

including "thirty-six (36) residential condominium units in four buildings to be constructed on the Land, together with all fixtures and appurtenances now or later to be located on the Land and/or in such Improvements." Id. at § 1.1.  There can be no doubt that the Bank understood that the Hagood Reserve Project was a condominium development.

Any conveyance of a unit in a condominium project must comply with the North Carolina Condominium Act, N.C.G.S. § 47C-1-101 *et seq.* (the "Act").  The very definition of a "Condominium" in the Act mandates that unit owners receive undivided interests in the related common elements.  The Act states:

> "Condominium" means real estate, portions of which are designated for separate ownership and the remainder of which is designated for common ownership solely by the owners of those portions.  *Real estate is not a condominium unless the undivided interests in the common elements are vested in the unit owners.*

N.C.G.S. § 47C-1-103(7) (emphasis added).

Moreover, any attempt to divorce the ownership of a Property from its allocated interest in the common elements is void.  See N.C.G.S. § 47C-2-107(e).  Again, it would be unreasonable for the Bank to assume the James Residence could or would be conveyed to the Trust without simultaneously conveying an undivided interest in the Common Elements.  The Debtor could not legally make such a conveyance, since to do so would violate not only the assumed Agreement between the Debtor and the Trust, but also the express terms of the Act.

### 4.    The Bank received the Draft Condominium Declaration.

The record in this proceeding further demonstrates that the Bank was aware that the Trust would receive an interest in the Common Elements upon closing of the sale.  At

the conclusion of the initial hearing on the Sale Motion, the Court afforded the Bank an

opportunity to request documents related to the sale.  See Hearing/Trial Tr. 109-11, June

16, 2010, ECF No. 88.  The Bank made such a request on June 21, 2010, and the Debtor

supplied responsive documents to the Bank's counsel on June 23, 2010.  Those

documents included the Draft Declaration.  The Bank acknowledged at the final sale

hearing on June 30, 2010, that it had received the Draft Declaration ("we have gotten the

prior declarations which the contract says are going to be recorded but can't be because

they are not proceeding with the development as they originally intended").  Exhibits to

Debtor's Br. in Opposition to the Mot. for Recons., Ex. E 8, ECF No. 168-6.

The Draft Declaration originally contemplated that all 36 units in the Property

would be constructed together, rather than in phases.  "Common Elements" were defined

as "all portions of the Condominium other than the Units, as depicted on the Plans, and as

more particularly described in Section 5.1 of this Declaration."  Exhibits to Debtor's Br.

in Opposition to the Mot. for Recons., Ex. D § 1.4, ECF No. 168-4.  Section 5.1, in turn,

included a more detailed description of the Common Elements, which included the

"Land," portions of any buildings outside the constructed units, parking areas, garden

areas, and the pond located on the Property.  Id. at § 5.1.  The "Land" was defined as the

entire 9.14-acre parcel, exclusive of improvements.  Id. at § 1.13.

The Draft Declaration defined a "Common Elements Interest" as "the undivided

percentage interest in the Common Elements allocated to each Unit, as set forth on

Exhibit B."  Id. at § 1.5.  Exhibit B to the Draft Declaration consisted of a chart showing

the pro rata percentage of the Common Elements allocated to each of the 36 units, based

on its interior square footage.  Id. at A-1, A-2 (attached as Ex. A to Public Offering

Statement).  In short, the Draft Declaration explicitly set forth that each unit in the

Property would be allocated an undivided interest in the Common Elements, which

consisted of the entire Hagood Reserve Property other than the completed units

themselves.  The Bank received the Draft Declaration and was on notice of the Debtor's

intent to convey an undivided interest in the Common Elements to the unit owners,

including the Trust, as is required by the Act.

> **5.      The Recorded Declaration is consistent with the Draft
> Declaration.**

Although not identical to the Draft Declaration in all respects, the revised

condominium declaration recorded in conjunction with the closing did not redefine the

Common Elements associated with the condominium in any way or change the Trust's

right to receive an interest therein.  Therefore, the Bank's assertion that it did not realize

an undivided interest in the Common Elements would be conveyed with the James

Residence fails.  Despite the Debtor's provision of any and all information requested by

the Bank regarding the planned condominium following the first sale hearing, the Bank

asserted at the final hearing that the Court should expand the scope of the Sale Order,

effectively granting it a direct role in finalizing the declaration, plat, and other

condominium documents prior to closing.

The Debtor objected, but readily offered to provide whatever additional

information the Bank reasonably requested.  Exhibits to Debtor's Br. in Opposition to the

Mot. for Recons., Ex. E 9-10, ECF No. 168-6.  Accordingly, the Court denied the Bank's

suggestion but instructed the Bank to itemize any additional information it wished to

review prior to the closing in writing.  The Bank stated it would provide such a written

request to the Debtor and/or the Court.  Id. at 10-11.  However, no such request (whether

written or otherwise) was provided to the Court or to the Debtor until after the Debtor

filed its Response and Objection to the Bank's Motion for Stay of the Sale Order on

August 9, 2010.  ECF No. 132.  The Bank's request was not timely, being both 40 days

after the final sale hearing and after the sale of the James Residence had closed.

Previously, following the final hearing on June 30, the Debtor began preparing to

close as quickly as possible.  This effort included revising the Draft Declaration to allow

the sale of the three existing Units, while reserving the right to construct the additional 33

units that had been originally planned.  The result of these revisions, the Final

Declaration, was recorded on August 6, 2010, prior to closing.

Although the Bank did not request copies of any revisions to the Draft

Declaration as it was entitled to do, it should be noted that the Final Declaration does not

alter the material provisions of the original document regarding the conveyance of

Common Element Interests.  The Final Declaration simply allows the development of

Hagood Reserve in phases, which is consistent with the sale of the James Residence

while the Project remains only partially completed.

A new section, entitled "Development Rights," authorizes (but does not require)

the Debtor, as the Declarant, to construct additional condominium units on the Hagood

Reserve Property in the future.  See Exhibits to Debtor's Response and Objection to the

Mot. for Stay, Art. VI, ECF No. 147-1.  The Final Declaration also revises the pro rata

percentage of Common Elements allocated to each existing unit.  The undivided interest

allocated to each unit is obviously larger (roughly 1/3 per residence) than in the Draft

Declaration, because there are only three units currently constructed.  However, the

allocated percentages are still strictly based on the interior square footage of the

completed units.  Id. at 34.

The definitions of "Common Elements," "Common Elements Interest," and "Land" remain fundamentally unchanged from the Draft Declaration, except for the recognition that the Declarant possesses the option to construct additional units.  Id. at §§ 1.5, 1.6, 1.15.  In that event, the Declarant is required to reallocate the Common Elements Interests among the greater number of units based on their interior square footage, and to record a "Supplementary Declaration" reflecting the existence of the new units and their revised percentages of the Common Elements.  Id. at §§ 5.3, 6.3.  Accordingly, it is an oversimplification to say that the Trust now owns one-third of the Common Elements as a result of the sale.  Rather, the Common Element Interest of the Trust as a unit owner will necessarily decrease if and when additional condominium units are constructed on the Property.

Thus, the Bank's argument that the Debtor underhandedly transferred a Common Element Interest to the Trust is not borne out by the facts.  The underlying Agreement, as well as the Act, required that the purchaser receive an undivided interest in the Common Elements.  The Debtor did not conceal what comprised the Common Elements under its development plan, nor its intention to convey an undivided interest in them to the Trust as part of the sale.  Instead, the Debtor openly shared its condominium plans, including the Draft Declaration, with the Bank in the weeks prior to the closing.

Furthermore, the sale of the James Residence was intentionally structured to comply with the terms of the Sale Order and to maintain flexibility with regard to future development of the Property.  The Final Declaration neither alters the unit owners' rights to receive undivided interests in the Common Elements as initially proposed, nor binds

the Debtor (or a successor Declarant) to complete the condominium project.  It

effectively allows the sale of the James Residence to proceed in accordance with the Act,

while maintaining the status quo with regard to the remainder of the Property.  Therefore,

the Sale Order should not be set aside on these grounds.

> ### 6.    Conveyance of the James Residence does not preclude other development options.

A word or two is in order regarding the Bank's argument that a conveyance of the

James Residence will force it to "live with an ill[-]conceived condominium project."

Mot. for Recons. and to Alter or Amend J. 3-4, ECF No. 158.  The first thing to be said is

that the Bank freely entered into its role as lender for the Project.  It only came to

consider the Project "ill-conceived" after the national real estate melt down in 2007-08

spread to the Charlotte market.  The Bank "lives," at least at present, with the deal that it

chose to underwrite.

Second, the Bank overlooks that it is the particular zoning classification of the

Hagood Reserve Property, rather than the sale of any particular unit, which requires the

remainder of the tract to be developed as a condominium.  As testified to by appraiser

Thomas B. Harris, Jr., the Property is zoned UR-2 (CD).  Hearing/Trial Tr. 49-50, June

16, 2010, ECF No. 88.  This is a "conditional zoning classification," meaning the

Property can only be developed according to the specific site plan presented by the

Debtor to the City of Charlotte.  Thus, "legally the site can only be developed as it sits

here specifically." Id. at 54 (testimony of Mr. Harris, referring to site plan exhibit).  Even

in the event a new owner of the land wished to develop it for some use other than the

condominium project proposed by the Debtor, that owner would first have to successfully

rezone the Property to an entirely different classification.  Thus, it is not the sale of a

Property consistent with the currently approved plan that limits alternative uses of the

Property; it is instead the restrictions attendant upon its current conditional zoning.

While the Bank conveniently insists that the sale of the James Residence to the Trust and

recording of the final plat precludes other development options, its argument ignores this

more fundamental hurdle.

Additionally, if the Debtor's reorganization attempt fails and the Bank ultimately

forecloses on the Property, it would then take title to any units still held by the Debtor.

Pursuant to its terms, the Final Declaration may be amended generally by the vote of 67%

of the unit owners.  See Exhibits to Debtor's Response and Objection to the Mot. for

Stay, Art. XV, ECF 147-1; see also N.C.G.S. § 47C-2-117 (stating same).  If the Bank

takes title to the remaining units held by the Debtor, it will control 67% of the votes of

the unit owners—the percentage required to amend the Final Declaration.  Id.  Under this

scenario, the Bank could then exercise the authority to amend the Final Declaration to

include as a development right the right of the Bank to withdraw certain portions of the

Property from the condominium.  See N.C.G.S. § 47C-2-110(d).

The Bank's argument that the sale of a single condominium unit necessarily

precludes other development options on the remainder of the Property is incorrect for this

additional reason.

### 7.     The Hagood Trust was not implicated in any acts of misconduct.

Finally, a word should be said about the buyer.  Section 363(m) measures the

good faith of the buyer, and not the seller.  While the parties' arguments relate to what

the Debtor may or may not have done, the statutory focus is on the Hagood Trust and its

actions.  The Hagood Trust, or more specifically the Jameses, is a hostage to a litigation

war between the Bank and the Debtor.  On the evidentiary record presented, there is no

suggestion that the Hagood Trust did anything fraudulent, collusive, or grossly unfair to

other bidders.  See Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3rd Cir. 1986).

Rather, the Bank's accusations are factually directed at its litigation opponents, the

Debtor and its principals.  Apart from the fact that the Jameses closed and paid their

money, there is nothing here factually to suggest any improper conduct on their part.

From the Jameses' perspective, in this closing they received nothing more than that

which they contracted to purchase long ago.  The repurchase was agreed to by the

Debtors (via the Purchase Agreement) even before the Bank made its Loan.  Given this,

even if the Debtor's actions constituted misconduct, the Hagood Trust's good faith

purchaser status would not be impaired.

For all of these reasons, under Section 363(m), and as interpreted by the Fourth

Circuit in Hazelbaker, the Bank's appeal is statutorily moot.

> **B.      The Bank has not met the burden for obtaining relief under Rule
> 60(b)(6) of the Federal Rules of Civil Procedure.**

Although the Court believes that Section 363(m) makes any effort to unwind this

sale untenable, we will briefly consider the Bank's Rule 60 motion in order to complete

the record for appeal.

The Bank contends that the Court should reconsider—and ultimately reverse—the

Sale Order it issued on July 12, 2010, pursuant to Rule 60(b)(6) of the Federal Rules of

Civil Procedure ("FRCP").  Its factual allegations are the same as those described above:

the Debtor did not inform the Court or the Bank of its intentions or actions with regard to

execution and recording of the Condominium Declaration or the Deed until after the

documents had been recorded on August 9, 2010, and that failure to provide such

information despite Debtor's knowledge of a Notice of Appeal, a Stay Motion, and a

hearing date constituted bad faith.  Moreover, the Bank argues Debtor did not permit an

opportunity to review the Condominium Declaration, the Plat, the Deed, the closing

statement, or any of the other closing documents.

Rule 60 of the FRCP is applicable to contested matters under the Bankruptcy

Code pursuant to Bankruptcy Rule 9024 and allows a litigant to request that a judgment

be reconsidered.  Specifically, FRCP 60(b)(6) authorizes a court to modify a prior

decision "based on 'any . . . reason justifying relief from the operation of the judgment.'"

Reid v. Angelone, 369 F.3d 363, 374 (4th Cir. 2004) (quoting Fed. R. Civ. P. 60(b)(6)).

The rule gives the court "a grand reservoir of equitable power to do justice in a particular

case." Reid, 369 F.3d at 274 (quoting Eberhardt v. Integrated Design & Constr., Inc.,

167 F.3d 861, 872 (4th Cir. 1999)).  However, a motion for reconsideration "should not

be used to ask the court 'to rethink what the court ha[s] already thought through—rightly

or wrongly." In re America West Airlines, Inc., 240 B.R. 34, 38 (Bankr. D. Ariz. 1999)

(quoting Above the Belt, Inc. v. Mel Bohannan Roofing, Inc., 99 F.R.D. 99, 101 (E.D.

Va. 1983)).

A movant asking for relief under FRCP 60(b) must make three initial showings:

"he must show that his motion is timely, that he has a meritorious defense to the action,

and that the opposing party would not be unfairly prejudiced by having the judgment set

aside." Park Corp. v. Lexington Ins. Co., 812 F.2d 894, 896 (4th Cir. 1987).  Upon such

a showing, the moving party must then satisfy at least one of the grounds of relief listed

in Rule 60(b) to obtain relief.  Id.

Here, the first prong—timeliness—would be met but for the fact that the sale was

closed.  However, the other two prongs are not satisfied.  The Bank has failed to put forth

a meritorious defense.  The Bank contends that the actions of the Debtor and Trust were

intended to "thwart the Bank's appeal of the Sale Order" and force the Bank to "live with

an ill[-]conceived condominium project."  Mot. for Recons. and to Alter or Amend J. 3-4,

August 26, 2010, ECF No. 158.  However, as previously noted, the Bank was aware of

the condominium project plans when it agreed to provide a loan to the Debtor in

December 2007.  It was aware that the Property is zoned specifically for the

condominium project.  Further, the Bank had procedural options that could have

prevented the sale from occurring prior to the August 11, 2010 Stay Motion hearing but

failed to use them.

Furthermore, the Bank cannot satisfy the third prong because reversing the Sale

Order would result in unfair prejudice toward the Debtor and the Trust.  The Debtor sold

in reliance on the Sale Order issued by the Court, and the Jameses were bona fide

purchasers who paid a fair value for the Residence.

Moreover, regardless of whether the three threshold prongs are met, the Bank fails

to demonstrate that relief under Rule 60(b)(6) is appropriate.  Relief is limited to

situations involving "extraordinary circumstances."  Dowell v. State Farm Fire and Cas.

Auto Ins. Co., 993 F.2d 46, 48 (4th Cir. 1993) (citing Ackermann v. United States, 340

U.S. 193, 202 (1950)).  In order "[f]or a movant's case to succeed, the material offered in

support of his Rule 60(b)(6) motion must be highly convincing."  Clayton v. Ameriquest

Mortg. Co., 331 B.R. 238, 242 (Bankr. M.D.N.C. 2005) (quoting Holland v. Virginia Lee

Co., Inc., 188 F.R.D. 241, 252 (W.D. Va. 1999).  Relief under Rule 60(b)(6) is "generally

unavailable" when "the moving party has failed to take legal steps to protect his

interests." Dynamic Changes Hypnosis Center, Inc. v. PCH Holding, LLC, 306 B.R. 800, 811 (Bankr. E.D. Va. 2004) (quoting Jardine, Gill & Duffus, Inc. v. M/V Cassiopeia, 523 F. Supp. 1076, 1085 (D. Md. 1981)).

In Dowell,

> Dowell made a considered choice not to appeal . . . . His choice was a risk, but calculated and deliberate and such follows a free choice. [Dowell] cannot be relieved of such a choice because hindsight seems to indicate to him that his decision not to appeal was probably wrong . . . . There must be an end to litigation someday, and free, calculated, deliberate choices are not to be relieved from.

Dowell, 993 F.2d at 48 (quoting Ackermann, 340 U.S. at 198). As a result, the Court did not give Dowell relief. Id. Similarly, the Bank had over 40 days to determine whether to appeal the Sale Order and to seek to extend the stay. Although the Bank eventually decided to appeal the Sale Order and filed a Motion for Stay of Order Pending Appeal, the Bank made a choice not to request any additional information it wished to review before the closing—despite the Court's suggestion to do so. Further, it unilaterally set the hearing on the Stay Motion well beyond the date the Order was to become effective. Moreover, it did not seek to extend the 14-day stay of the Sale Order under Rule 6004(h) of the Bankruptcy Rules.

Here, the Court does not find the circumstances to be extraordinary to the extent it would require the Court to alter or amend its Sale Motion, which would essentially require it to attempt to undo a conveyance that has already occurred and been recorded.

For the aforementioned reasons, the Bank's Motion for Reconsideration and to Alter or Amend the July 12, 2010 Order is **DENIED**.

**C.      The Bank's Motion for Stay of Order Pending Appeal is now moot
because of the Court's denial of the Bank's Motion to Reconsider and
to Alter or Amend Judgment.**

Because the Bank's Motion to Reconsider and to Alter or Amend Judgment has

been denied, there is nothing to stay and no ability to do so.  The Bank's Motion for Stay

is **DENIED.**

**SO ORDERED.**

This Order has been signed electronically.          United States Bankruptcy Court
The judge's signature and the court's seal
appear at the top of the Order.